UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH ANTHONY AMANTE,

      Plaintiff,

v.

DEPUTY TYLER BACHMAN,
DEPUTY JOSHUA RACZKA,
DEPUTY MICHELLE FRANCISCO,
DEPUTY STEVEN CARTER,
DEPUTY BRENT SCHIPANI,
DEPUTY JOSHUA SWALWELL,
DEPUTY RICHARD RACKLEY,
DEPUTY KEVIN BILBIA, and
OAKLAND COUNTY

      Defendants.

Case No. 21-10644
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [27]**

---

In July 2020, Joseph Anthony Amante was arrested on the street after an officer found brass knuckles in his pocket. He was put in a patrol car for transport to the Oakland County Jail. Amante told officers that he had to use the bathroom while he was in the patrol car. He told them again upon his arrival to the jail. And he told them several more times while he was being booked and searched. He was informed he would have to wait until after he was strip searched at the jail.

Amante was taken to a single-person cell at the jail because of his "uncooperative" behavior—namely, yelling and swearing at deputies. He was strip searched in front of six officers. During the search, and after he removed all of his

clothes, Amante attempted to use the toilet in the cell, but was again told to wait until the strip search was completed. Amante began urinating on the wall, and then urinated on Officer Tyler Bachman's pants or shoes.

At that moment, Bachman took Amante to the ground. Officers Brent Schipani, Joshua Swalwell, and Kevin Bilbia assisted with the takedown and restrained Amante's limbs with their hands once he was on the ground. Officers Steven Carter, Joshua Raczka, and Richard Rackley watched as the takedown unfolded. After officers secured Amante on the ground, they left the cell and Amante was allowed to use the toilet. Around ten minutes passed from the time he arrived at the jail to the time he was allowed to use the toilet.

Amante believes that this encounter violated his Fourth Amendment rights in three main ways: one, he was unreasonably deprived of access to the bathroom; two, he was unreasonably strip searched in front of six officers; and three, officers used excessive force against him in the cell or failed to intervene in the use of such force against him. So he sued Bachman, Raczka, Carter, Schipani, Swalwell, Rackley, Bilbia, their supervisor Michelle Francisco, and Oakland County for violating 42 U.S.C. § 1983 and Michigan tort law.

After engaging in discovery, Defendants moved for summary judgment on all claims. For the following reasons, the Court finds that a portion of Amante's excessive-force claim may proceed to trial. The other claims, including all claims against Raczka, Rackley, Carter, Francisco, and Oakland County, are dismissed.

# I. Background

## A. Facts

As Defendants seek summary judgment, the Court accepts as true Amante's version of the events to the extent it diverges from Defendants'. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In late July 2020, Officer Kurtis Harrison was patrolling when he encountered 18-year-old Joseph Amante and Polan Evan walking toward a trailer park around 2:30 a.m. Harrison noted that "Amante appeared to be intoxicated [and was] having problems walking." (ECF No. 27-3, PageID.305.) Harrison asked where the two were going, to which Amante responded, "where are you going?" (*Id.*) Eventually, Amante started yelling "leave officer get the hell out of here," and then, "help me officer, help me I am being assaulted, help me." (*Id.* at PageID.306.)

At that point, Harrison approached Amante and Polan and patted them down for weapons. (*Id.*) He found brass knuckles in Amante's pocket. (*Id.*) Harrison arrested Amante for carrying a concealed weapon, which is a felony. (*Id.*) Eventually, Amante was placed in the back of another officer's patrol car. (Video Ex. C, 22:30.) About eight minutes later, video evidence showed Amante telling an officer that he had to use the bathroom, to which the officer responded he could not let him go to the bathroom on the side of the street. (*Id.* at 30:10–30:18.) The officer said, "if you piss yourself back there, you piss yourself back there. I'll get someone to clean it." (*Id.* at 30:25.) While in the patrol car, Amante can be heard yelling and swearing at officers. (*See, e.g.*, *id.* at 34:44.)

3

At 3:32 a.m., Amante arrived at the Oakland County Jail. (Video Ex. E.) Officers Tyler Bachman and Kevin Bilbia met him at the jail, and Amante informed them he had to use the bathroom. (ECF No. 27-7, PageID.350–351.) He was told he had to wait until the officers completed the required searches. (ECF No. 27-7, PageID.359; ECF No. 27-2, PageID.218.)

The officers conducted a custody search, where they frisked Amante's person at the booking window. (Video Ex. H.) Amante can be seen moving his legs from side-to-side and squirming, presumably because he had to use the restroom. (*Id.* at 1:30.) The officers told him to keep his hands on the booking window and had to redirect him to do so one time. (*Id.* at PageID.340.)

Bachman stated that throughout this time, "Amante was continuing to scream and yell at deputies." (ECF No. 27-7, PageID.337; *id.* at PageID.342 ("The entire time he was swearing at deputies, calling us names and being verbally assaultive.").) But the officers agree that he never made any threats toward them, and no officer stated Amante was physically combative or resisting other than by swearing at officers. (ECF No. 27-7, PageID.330, 342, 368; ECF No. 31-6, PageID.722, 725; ECF No. 31-7, PageID.738.)

After the custody search, Amante was taken to a cell—and not the general "uncuff" area—because he was being "uncooperative." (*See, e.g.*, ECF No. 27-7, PageID.347.) Because of his felony charge and because individuals cannot have street clothes on in the cell, Amante was strip-searched. (*Id.* at PageID.348.) Six deputies— Bachman, Bilbia, Joshua Raczka, Brent Schipani, Joshua Swalwell, and Richard

Rackley—went into the cell with Amante for the strip search. (Video Ex. L, :09 (sealed[1]).) Four officers surrounded him while two remained closer to the door and bagged Amante's clothes as he removed them. (*Id.* at :20–:25 (sealed).) The officers stated that they all participated in the search in case Amante's "verbally assaultive" behavior escalated into physical violence. (*See, e.g.*, ECF No. 27-10, PageID.469 ("[If s]omebody [is] being uncooperative and bringing attention to themselves, yelling, screaming," they might "get the attention of other deputies [who] might come over to that area to basically make sure everything's okay. . . . People do things[,] so sometimes having a few extra people around . . . make[s] it secured and safe.").

The video shows Amante removing his clothes in the cell. After he does that, he moved toward Bachman. (Video Ex. L, :45 (sealed).) Bachman was standing between Amante and the toilet. (ECF No. 27-7, PageID.352; ECF No. 31, PageID.724; ECF No. 31-7, PageID.726.) Bachman pushed Amante away from him and the toilet. (Video Ex. L, :46 (sealed).)

A few seconds later, things escalated. Though the video footage is not clear, several officers reported that Amante began urinating on the wall. (ECF No. 31-6, PageID.725; ECF No. 31-7, PageID.737.) Amante testified that he had told officers that once he removed his clothes, he would no longer be able to wait to use the restroom. (ECF No. 31-1, PageID.648.) Bachman testified that Amante then said,

---

[1] The Court granted Defendants' unopposed motion to seal the two videos of the cell because Amante is naked during relevant portions. (*See* ECF No. 25.) In its text order, the Court stated that it would revisit the order if a party seeks to admit the video into evidence at trial.

"Fuck this. I'm just going to piss on you then," and began to urinate on him. (ECF No. 27-7, PageID.359.) The video evidence shows Amante turning slightly toward Bachman at this moment. (Video Ex. M, :50 (sealed).)

Bachman immediately performed an "inside takedown" of Amante. (Video Ex. L, :51 (sealed); Video Ex. M, :51 (sealed); *see* ECF No. 27-7, PageID.368 ("I secure my hands on the inmate's head, bring them over to my waist and then take them to the ground.").) Swalwell, Schipani, and Bilbia assisted with the takedown and restrained Amante on the ground. (ECF No. 27-7, PageID.369; *see generally* Video Ex. L (sealed).) Swalwell and Schipani secured Amante's arms and Bilbia secured his legs, though no defendant used handcuffs or any other sort of tool to restrain Amante. (ECF No. 31-7, PageID.742.) Raczka, Rackley, and Officer Steven Carter can be seen near the cell watching this unfold. (ECF No. 31-3, PageID.682, 683, 684; Video Ex. L (sealed).)

The video does not show exactly what happened once Amante is on the ground, but officers can be seen dragging him away from the wall and restraining him. (Video Ex. L, :51–2:28 (sealed).) Amante testified that after the takedown, he saw "in my mirror that I had blood and my mask was completely soaked in blood that they made me throw away. Even the secondary mask I had still had traces of blood on it, that's how much I was bleeding." (ECF No. 31-1, PageID.649.)

Once the officers left, Amante used the toilet in the cell. (*Id.* at 3:12.) A little more than ten minutes had passed since Amante arrived at the jail. (Video Ex. E (at

3:34 a.m., car with Amante arrives at the jail carport); Ex. L (at 3:44 a.m., the officers leave Amante alone in the cell, where he then uses the toilet(sealed)).)

The next day, following his release, Amante saw an Ascension physician. Amante told the physician that the officers "knocked him down and punched him and kicked him in the head as well as multiple other areas." (ECF No. 31-10, PageID.774.) The report noted some abrasions (but no lacerations) in the temporal area, eyebrow, and chin. (*Id.* at PageID.775.) The physician also noted tenderness on Amante's neck. (*Id.*) The report stated Amante's nasal mucosa did "not show any signs of bleeding or trauma." (*Id.*) Three days after that, Amante went to Ascension again. (ECF No. 31-11.) The report shows a diagnosis of "postconcussional syndrome." (*Id.* at PageID.783.)

## B. Procedural History

In time, Amante sued Bachman, Raczka, Carter, Schipani, Swalwell, Rackley, Bilbia, on-duty supervisor Michelle Francisco, and Oakland County. (ECF No. 1.) He alleged Defendants are liable for using excessive force against him (Count I); violating his Fourth Amendment rights to have access to a restroom and to a reasonable strip search (Count II); assault and battery under Michigan law (Count III); intentional infliction of emotional distress under Michigan law (Count IV); and a *Monell* claim against the County (Count V).

After completing discovery, Defendants moved for summary judgment on all counts. (ECF No. 27.) That motion is before the Court. Given the adequate briefing

and record, the Court considers the motion without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Standard of Review

Federal Rule of Civil Procedure 56 provides, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Or, stated less formally, Defendants are entitled to summary judgment only if no reasonable jury could find in favor of Amante. *See Anderson*, 477 U.S. at 251–52.

## III. Constitutional Claims against Individual Officers

Amante challenges the constitutionality of three distinct actions taken by Defendants: one, their prohibition on him using the restroom until after the strip search was completed, two, the strip search conducted by six deputies, and three, the takedown that took place in the cell. The Court addresses each in turn.

### A. Denial of Use of Bathroom

Amante argues that Defendants unconstitutionally denied him access to a bathroom despite his repeated requests to use one. Defendants believe they are entitled to qualified immunity on this claim.

"Denying an arrestee access to the bathroom can be a violation of the Fourth Amendment right to be free from unreasonable seizures." *Juarez v. Pizana*, No. 3:17-

CV-00368, 2018 WL 7198152, at *8 (W.D. Tex. Dec. 12, 2018) (citing *Heitschmidt v. City of Houston*, 161 F.3d 834, 839–40 (5th Cir. 1998)); *see also Burchett v. Kiefer*, 310 F.3d 937, 945 (6th Cir. 2002) ("The Supreme Court has noted that under certain circumstances 'unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks' can violate the Eighth Amendment's prohibition on 'unnecessary and wanton infliction of pain.' Such actions a fortiori violate the Fourth Amendment, which requires a showing of objective unreasonableness rather than any particular subjective motivation." (citing in part *Graham v. Connor*, 490 U.S. 386, 398 (1989))); *Taylor v. Liss*, No. 05-71728, 2006 WL 1851096, at *7 (E.D. Mich. July 5, 2006) (recognizing deprivation of bathroom as a Fourth Amendment violation).

As with other Fourth Amendment violations, "the central inquiry is whether the denial is objectively reasonable. Relevant factors include the law enforcement justifications, the length of time the arrestee was denied bathroom access, and the number of requests." *Juarez*, 2018 WL 7198152, at *8.

So the Court begins by considering how long Defendants deprived Amante access to a bathroom. *See Little v. Gore*, 148 F. Supp. 3d 936, 953 (S.D. Cal. 2015) ("[T]he length of time of the detention is particularly relevant.").

Defendants are only responsible for a portion of the time Amante waited to use the bathroom. *See Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 490 (6th Cir. 2020) ("Two traditional tort principles show that a § 1983 plaintiff generally must prove both that a defendant was personally at fault and that the defendant's culpable

conduct (not somebody else's) caused the injury."). As Defendants point out, video footage captures the time from when Amante arrived at the Oakland County Jail—where he was met by Bachman—to when he was left alone in his cell and allowed to use the toilet. It is a little over 10 minutes. (Video Ex. E (at 3:34 a.m., car with Amante arrives at carport); Ex. L (at 3:44 a.m., the officers leave Amante alone in the cell, where he then uses the toilet (sealed)).)

Amante believes Defendants are responsible for much more than 10 minutes. He states that it is undisputed that he informed the arresting officer of his need to use the bathroom, which occurred well before he arrived at the Jail. While that is true (*see* ECF No. 27, PageID.141), Defendants were not present when that occurred. And under the Fourth Amendment, reasonableness is judged from the perspective of the officer and what they knew at the time. *See, e.g.*, *White v. Pauly*, 580 U.S. 73, 76–77 (2017) ("Because this case concerns the defense of qualified immunity, however, the Court considers only the facts that were knowable to the defendant officers." (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015))). Nothing in the record indicates that Defendants were made aware that Amante had to use the restroom from the time he was first detained in the police car by the arresting officer. Bachman testified that he knew Amante had to use the bathroom because Amante told him upon his arrival to the jail. (ECF No. 27-7, PageID.350–351.) Based on this information, Bachman may have reasonably thought that Amante had been waiting a few minutes to use the bathroom. So taking Bachman's perspective, the question becomes whether a 10-or-so-minute delay is an unreasonable amount of time to require someone to wait

10

for the bathroom without knowing, as Bachman testified, that Amante was intoxicated (*see* ECF No. 27-7, PageID.344), and thus perhaps less able to wait.

Amante resists this framing by saying that Bachman testified that "more or less an hour" had passed from the time Amante arrived at the jail to the time he was allowed to use the toilet. (ECF No. 31, PageID.610.) That misconstrues the record. Bachman first testified that he did not know how much time had elapsed, and then when asked whether it was "[m]ore or less than an hour," he responded, "Less." (ECF No. 27-7, PageID.360.) And of course, the 10 minutes demonstrated by the time stamps on the videos is much less than an hour. So only a 10-or-so-minute delay can be attributed to Bachman (or, as far as the Court is aware, any other Defendant).

Using the 10-minute delay, Defendants argue that qualified immunity shields them from Amante's claim. The Court agrees. Amante points to no circuit or Supreme Court case law that states that a short delay, like the one attributed to Defendants here, could result in a constitutional violation. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) ("Neither Cortesluna nor the Court of Appeals identified any Supreme Court case that addresses facts like the ones at issue here. . . [And e]ven assuming that Circuit precedent can clearly establish law for purposes of § 1983, [it] is materially distinguishable and thus does not govern the facts of this case."); *see also Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020) ("Reasonable officers in this circuit will pay attention to this court's caselaw. After all, that's the law that governs their actions. But we can't expect officers to keep track of persuasive authority from every one of our sister circuits."). The cases the Court identified on this issue typically

involve a delay of at least an hour, if not more. *See, e.g.*, *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (finding that confinement for seven-hour period with no bathroom breaks, among other factors, was unconstitutional under the Eighth Amendment); *Heitschmidt*, 161 F.3d at 837 (four-hour delay unconstitutional); *Juarez*, 2018 WL 7198152, at *8 ("Denial for as little as one hour has been held [by a district court] to potentially violate the Fourth Amendment."); *Taylor v. Liss*, No. 05-71728, 2006 WL 1851096, at *7 (E.D. Mich. July 5, 2006) (finding six- or seven-hour delay unconstitutional). So a 10-minute delay is not clearly established as unreasonable based on the case law.

Apart from the length of the delay, Defendants provided explanations—both to Amante in the moment and on the record—for why Amante had to wait to use the bathroom. When Amante told the arresting officer he had to use the restroom while he was in the police car, the arresting officer said that he would have to wait because he could not go to the bathroom on the side of the road. (Video Ex. C, 29:45.) Then, when he got to the station, Bachman told Amante he needed to go through a custody search and strip search before he could use the restroom. (ECF No. 27-7, PageID.359; ECF No. 27-2, PageID.218.) Bachman testified that these procedures were necessary safety precautions before someone with a felony arrest is allowed to enter the jail population. (ECF No. 27-7, PageID.334 (agreeing that a custody search is necessary to ensure no contraband or weapons on the individual); *id.* at PageID.348 (strip search required because detainees cannot wear street clothes in the cell and because of felony charge); ECF No. 31-8, PageID.745 ("Deputies are authorized to strip search

an inmate or pretrial detainee who is lodged for a felony as part of the booking process or when reentering the jail to ensure that no contraband is being smuggled into the jail.").) Bachman further testified that he has experienced a couple of instances where an individual has attempted to use the bathroom to get rid of contraband (ECF No. 27-7, PageID.390), which is why he needed to strip search Amante before he could relieve himself.

These facts distinguish this case from other cases where courts have found a delay in bathroom access to be unreasonable. *See Elizondo-Sedillo v. City of Albuquerque*, No. 114CV00127, 2014 WL 12769386, at *5 (D.N.M. Aug. 15, 2014) ("Notably, Defendants do not make any attempt to explain or justify the alleged decision to refuse Plaintiff access to a restroom despite multiple requests."). And as the Sixth Circuit has stated, the prior cases' consideration of the specific justifications at issue is an especially important factor in determining whether those cases clearly establish that the conduct is unconstitutional. *See Sumpter v. Wayne Cnty.*, 868 F.3d 473, 485 (6th Cir. 2017) ("Nowhere is that specificity as important as in the Fourth Amendment context, where, under the governing ad-hoc interest-balancing test, '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" (quoting in part *Mullenix v. Luna*, 577 U.S. 7, 12 (2015))); *id.* at 487 ("To put it in more descriptive terms: it is easy enough to predict how scales with one hundred apples on one end will balance out, but it is far more difficult to predict how many oranges must be added to the other side to bring it to equipoise."). Notably, Amante has not provided

any law that clearly establishes that depriving a detainee of bathroom access for under an hour to ensure officer safety and preservation of evidence is unconstitutional.

Rather than providing case law, Amante mounts a factual challenge against Bachman's justifications. He argues that, per the Oakland County Sheriff's Office policy, Bachman had the authority to allow Amante to use the restroom before he was searched. But a possible violation of a policy does not necessarily equate to a constitutional violation. *See Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("A [municipality] can certainly choose to hold its officers to a higher standard than that required by the Constitution without being subjected to increased liability under § 1983.").

Further, it is not clear that the provision Amante relies on applied to him. The policy states, "[w]hen an inmate requests time to use the restroom, Booking personnel shall contact the Receiving Deputies. The Receiving Deputies will determine if the area is clear for uncuff traffic and direct the inmate to the restroom area." (ECF No. 31-8, PageID.750.) This section comes after directions for conducting a custody search, taking the individual to the laundry where they will change out of their civilian clothing, and then taking them to the "Uncuff Area[.]" (*Id.*) It is in that area where the policy appears to apply. But a person who was "deemed uncooperative," like Amante, would not go to the uncuff area. (ECF No. 27-10, PageID.447, 492–493 ("That's for a normal typical arrest that's compliant and following orders and in the uncuff cell.").)

14

And even if the policy did apply, it appears that Defendants' treatment of Amante largely comported with it. Under the policy, an individual goes through a custody search, goes to laundry to change out of civilian clothes, and then goes to the uncuff area where, after officers secured the area, they would be allowed to use the bathroom. (ECF No. 31-8, PageID.749–750.) Amante had to go through similar steps before he was allowed to use the restroom—custody search, strip search, then use of restroom. So the policy does not definitively provide instructions for bathroom access before all requisite searches are complete, and thus, does not tend to prove that Bachman's safety justifications were overblown or unsupported. *See Sumpter*, 868 F.3d at 484 (stating that "substantial evidence" was needed to show that asserted penological justifications were "exaggerated" (citing *Bell v. Wolfish*, 441 U.S. 520, 548 (1979)).

In the same vein, Amante argues that a reasonable jury could find that Bachman was able to achieve the same safety goals via an alternative approach. One such alternative, according to Amante, is for Bachman to have observed Amante use the restroom to ensure no contraband was disposed of. For one, it is not entirely clear which option is least offensive to the Fourth Amendment—being observed while using the restroom or being forced to wait to use the restroom so officers can complete all requisite searches.

And regardless of the alternatives, Defendants are not required by the Constitution to take what might be considered (at least in hindsight) the best course of action. *See Graham v. Connor*, 490 U.S. 386, 396, (1989) ("The reasonableness of a

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). Instead, the Fourth Amendment employs a reasonableness standard that could cover a range of actions. And qualified immunity focuses on whether "any reasonable official in the defendant's shoes would have understood" he was violating the Constitution. *See Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 276 (6th Cir. 2020). Here, it would have been reasonable—maybe even preferred—for Bachman to allow Amante to relieve himself before the strip search. But, without knowing how long Amante had been waiting nor that he was intoxicated, was it unreasonable for Bachman to take a 10-minute detour and strip-search Amante before allowing him to use the bathroom? Neither circuit nor Supreme Court case law has established that it is. So the Court cannot say Defendants had "fair warning" they were violating the Fourth Amendment by not allowing Amante to use the restroom until after the strip search was complete. *See Ouza*, 969 F.3d at 276.

In sum, Amante's claim fails at summary judgment as he has not shown that Bachman or the other defendants violated clearly established law by forcing him to wait 10 minutes to use the toilet.

### B. Strip Search

Amante also claims that the strip search was unreasonable because it was done in front of six officers.

The video evidence confirms that there were six officers in the cell when the strip search began. (Video Ex. L, 0:20 (sealed).) Four officers, including Bachman,

surrounded Amante, and two other officers closest to the door bagged Amante's clothes as he removed them. (*Id.* at 0:30 (sealed).) After Bachman used the "inside takedown" maneuver to get Amante to the ground, three officers appear to have assisted with restraining Amante on the ground while one blocked the door. (*Id.* at 1:06 (sealed).) One officer stood close by as this happens, but at one point, he began holding the door. (*Id.* at 1:18 (sealed).)

Pursuant to Supreme Court precedent, Defendants were permitted to strip-search Amante before he entered the jail population. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330 (2012) (refusing to adopt a rule that correctional officers must have reasonable suspicion before strip searching a detainee before entering a jail). But that is not the end of the inquiry. Though conducting a strip search may have been reasonable to ensure Amante had no hidden contraband, including weapons or drugs, on his person, the manner in which the strip search was conducted must also be reasonable. *Stoudemire v. Mich. Dep't of Corrections*, 705 F.3d 560, 572 (6th Cir. 2013). And the question of reasonableness is determined using a three-part analysis: first, the Court determines the nature of the intrusion, which includes the scope, manner, and location of the search; second, it evaluates the need for conducting the search in that particular way, and third, it determines "whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.*

The Court begins by evaluating the level of intrusion. As courts have repeatedly recognized, "a strip search, by its very nature, constitutes an extreme

intrusion upon personal privacy, as well as an offense to the dignity of the individual." *Stoudemire*, 705 F.3d at 572–73.

Amante contends his strip search involved a heightened level of invasiveness— that "like in *Stoudemire*, there is reason to question the motives behind the strip search." (ECF No. 31, PageID.623.) One basis for this argument is the report of Ken Katsaris, Amante's expert. Katsaris opines, "The officers were anything but sensitive to putting Amante through the process." (ECF No. 31-9, PageID.770.) But Katsaris' only example of Defendants' lack of sensitivity is that "a strip search must be authorized," but there was no authorization documented. (*Id.*) However, Katsaris' own report—a mere three sentences prior—acknowledges that "[t]he strip search of Amante was authorized because he was booked on a felony violation." (*Id.*) The first page of the Oakland County Sheriff's Office policy confirms this: "Deputies are authorized to strip search an inmate or pretrial detainee who is lodged for a felony as part of the booking process . . . . No additional authorization is required." (ECF No. 31-8, PageID.745.) So Katsaris' report is inconsistent both internally and with record evidence. Further, it is not clear why lack of authority to conduct a search necessarily means that the search was conducted in an unconstitutionally invasive manner. So Amante has not presented sufficient evidence for a reasonable jury to believe that Amante or other defendants had "punitive intent" toward him while strip searching him. (*See* ECF No. 31, PageID.623.)

However, the Court finds that Amante has shown that he was subject to a more intrusive strip search because there were six officers present. As Amante points out,

in *Stoudemire*, the Sixth Circuit explained "the obvious: a strip search is more invasive when its performed where other people can see the person being stripped." 705 F.3d at 573.

But the issue with Amante's claim becomes clear when the Court moves on to the next step of the analysis—the penological justification. Unlike in *Stoudemire*, where the Court noted "no such exigencies" that "compelled [Defendant] to strip search Stoudemire in view of other inmates and prison personnel," 705 F.3d at 573–74, the record here shows that Defendants had proper reasons for conducting the strip search in front of six officers. Carter stated that if "[s]omebody [is] being uncooperative and bringing attention to themselves, yelling, screaming," they might "get the attention of other deputies [who] might come over to that area to basically make sure everything's okay. . . . People do things[,] so sometimes having a few extra people around . . . make[s] it secured and safe." (ECF No. 27-10, PageID.469.) Bilbia agreed: "I would say a minimum of two for strip search just in general, but if they're being uncooperative then we tend to have more people over there to help out just for safety and security." (ECF No. 27-11, PageID.566–567.) Rackley and Swalwell provided similar reasoning. (ECF No. 31-6, PageID.729 (Rackley stating, "Just during the course of my work, usually when people get loud and abrasive like that, it's very situation-based, but it can lead to that, a physical altercation. So we just stand by just in case."); ECF No. 31-7, PageID.741 (Swalwell stating he assisted with the search because of "Amante's demeanor and verbal aggressiveness toward deputies[.]").) For his part, Amante does not remember what he said to the officers

19

but does not necessarily deny swearing at them. (ECF No. 31-1, PageID.646 ("Q. You do not doubt that you said that? A. Yeah. I don't want to lie to you and say that's not a word or a phrase that would never exit my mouth."); *see also* Video Ex. C (Amante swearing loudly at officers while in the back of police car).) Indeed, in explaining why the evidence of a penological justification was lacking, the *Stoudemire* court cited examples of possible justifications for the search, including officer safety or the detainee's "maladaptive behavior[.]" 705 F.3d at 574.

Defendants' penological justification for having six officers present during Amante's strip search raises two issues. One, it makes it more difficult for Amante to argue that the search was unreasonable at the third step—the balancing test. Amante argues that "surely, simply saying 'all these people needed to watch the strip search' doesn't make it so." (ECF No. 31, PageID.623.) But in some ways, it does. Defendants do not merely state their justifications in their briefing—they testified to them under oath. And most importantly, Amante does not provide any evidence that would allow a reasonable jury to question or disregard Defendants' justifications for the search. *See Sumpter*, 868 F.3d 473, 484 (6th Cir. 2017) ("And in response to defendants' motion for summary judgment below, plaintiff presented no evidence to dispute their asserted penological justification, much less 'substantial evidence' that Wayne County 'exaggerated their response to these considerations.'" (quoting *Bell*, 441 U.S. at 548)). And without contrary evidence, a jury could not find it unreasonable to have multiple officers present during a strip search when there is a demonstrable

risk of the detainee's verbal uncooperativeness escalating. Without such evidence, Defendants' reasons stand and are balanced against the intrusiveness of the search.

But, as the Sixth Circuit has stated, the Court "need not go that far in order to determine" whether Defendants are entitled to qualified immunity. *Sumpter*, 868 F.3d at 485. "The absence of a decision that 'squarely governs' this situation is particularly detrimental to plaintiff's claim because, when the constitutional test is one of interest-balancing, the point at which the constitutional shades into the unconstitutional will necessarily be gray. . . . Strip searches, even when conducted in the most private circumstances, are intrusive. But in the absence of bright lines and per se prohibitions, whether and when to subject inmates to increasingly intrusive searches depends on the facts confronting the corrections official in each particular case." *Sumpter*, 868 F.3d at 488 (internal citations omitted).

That brings the Court to the second, more fatal, issue. Like in *Sumpter*, Amante has not provided clearly established case law showing that, when faced with the particular circumstances Defendants encountered here, it was unconstitutional to have multiple officers view a strip search. Amante relies on *Stoudemire* alone to show that a strip search is more invasive when performed in front of others. But *Stoudemire* is "distinguishable in one important respect . . . there was *no* penological justification for the particular searches at issue. This critical difference makes *Stoudemire* . . . [a] poor template for declaring the particularized right at issue in this case—freedom from a group strip search *supported* by a legitimate penological justification—clearly established." *Sumpter*, 868 F.3d at 486 (cleaned up).

In sum, the Court finds that Defendants have provided a penological justification for having six officers present during the strip search of Amante. And because of this asserted justification, Amante has not shown that Defendants violated clearly established law. Thus, qualified immunity bars Amante's strip-search claim.

## C. Takedown in Cell

The last of Amante's three constitutional claims is that the officers used excessive force against him when he was taken down to the ground in the cell. As part of this claim, the Court will address two issues raised by the parties.

### 1. The Kick

Amante stated in his deposition that he "was struck by a deputy. I can almost vividly remember getting kicked in the face as he walked out of the cell." (ECF No. 27-2, PageID.233.) However, he cannot identify which Defendant kicked him. (*Id.*)

The Sixth Circuit confronted a similar issue in *Pineda*. There, the Court asked "whether Pineda may obtain a trial against all three deputies even though only one was the 'person' who inflicted the blow and 'subjected' him to a constitutional 'deprivation.'" *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 489 (6th Cir. 2020) (quoting 42 U.S.C. § 1983). The Court concluded that "a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial." *Id.* at 491. Where a plaintiff does not know who committed the specific constitutional wrong, one way he can meet the standard set out above is by alleging that, though one defendant "inflicted the blow," the other defendants violated the Constitution by failing to intervene to prevent the

22

unconstitutional conduct. *Id.* at 492–93 (discussing *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019)). That is how Amante wishes to proceed here. (ECF No. 31, PageID.619.)

But it appears that he cannot do so. Only one Defendant is responsible for the single kick Amante recalls. But a kick could not have taken much time—at most, a few seconds. And because of the short amount of time it would take to kick someone, no jury could find that other officers had the "opportunity . . . to prevent the harm from occurring." *See Pineda*, 977 F.3d at 493 ("[O]ur caselaw suggests that an excessive use of force lasting ten seconds or less does not give a defendant enough time to perceive the incident and intervene to stop such force."); *see also Grinnell v. City of Taylor, Michigan*, No. 21-2748, 2022 WL 1562291, at *6 (6th Cir. May 18, 2022) ("[W]here the 'act of excessive force unfolds in a matter of seconds, the second requirement is generally not satisfied.'" (quoting *Alexander v. Carter for Byrd*, 733 F. App'x 256, 265 (6th Cir. 2018))).

Thus, Amante has not presented evidence from "which a jury could find that each defendant engaged in an unconstitutional act" regarding the kick. *See Pineda*, 977 F.3d at 493. So he may not proceed with his allegations about the kick at trial.

### 2. The Takedown

Amante also alleges that Defendants acted unconstitutionally by taking him down to the ground. After Amante began urinating, Bachman performed an "inside takedown," which he described as "when I secure my hands on the inmate's head, bring them over to my waist and then take them to the ground." (ECF No. 27-7,

PageID.368; ECF No. 27-10, PageID.462 ("I would describe it as close proximity and grabbing like about the back of the head, shoulder area to get a subject – to bring him down lower to the ground to gain control.").) The record shows that three other Defendants—Swalwell, Schipani, and Bilbia—assisted with the takedown and restrained Amante on the ground with their hands. (ECF No. 27-7, PageID.369; *see generally* Video Ex. L (sealed).) Swalwell and Schipani secured Amante's arms and Bilbia secured his legs, though no Defendant used handcuffs or any other sort of tool to restrain Amante once he was taken to the ground. (ECF No. 31-7, PageID.742.)

Video footage of the cell corroborates this testimony: six officers can be seen entering the cell with Amante (Video Ex. L, :10–:14 (sealed)); four officers surround him while two are closer to the door (*id.* at :27); at some point, Amante moves toward Bachman, who was standing in front of the toilet, and Bachman pushes him back and away from the toilet (*id.* at :45); Amante starts urinating (Video Ex. M, :51); a second later, Amante is taken down by Bachman, and three other deputies assist in securing Amante away from the wall, while two others observe close by (Video Ex. L, :51–1:03).

Defendants assert they have qualified immunity against this claim because Amante can show neither that the force used was unreasonable or that the violation was clearly established at the time the incident occurred. *See, e.g.*, *Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 399 (6th Cir. 2022). The Court disagrees.

Start with the constitutional violation. It appears that Amante's excessive-force claim is governed by the Fourth Amendment, as opposed to the Fourteenth Amendment, though both employ the same standard. *See Malory v. Whiting*, 489 F.

App'x 78, 81 (6th Cir. 2012) ("The Sixth Circuit has explained that '[t]he Fourth Amendment of the United States Constitution protects a person from being subjected to excessive physical force during the course of an arrest, a booking, or other police seizure.'" (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009))); *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (holding that in the wake of the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment").

Thus, Defendants conduct is judged by an objective reasonableness standard. In other words, "the Court balances the government's interest in preventing crime and protecting the public and the officers against a suspect's interest in avoiding injury." *Gambrel*, 25 F.4th at 400. To that end, the Supreme Court has articulated some non-exhaustive factors that may bear on the reasonableness of the force used: "the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

A reasonable jury could find that the force used against Amante was excessive based on an evaluation of these factors. Defendants rely on their own characterization of Amante's conduct to argue that the takedown was reasonable. They state, "Plaintiff

physically assaulted Bachman when he urinated on his leg" and that "the deputies were dealing with a noncompliant and verbally assaultive detainee[.]" (ECF No. 27, PageID.158.) But record evidence could tell a different story.

For starters, it is not clear that Amante intentionally urinated on Bachman. The video briefly shows Amante turning toward Bachman (and presumably urinating) before he is taken down. (Video Ex. M, :51 (sealed).) It does not conclusively show that Amante intentionally urinated on Bachman, especially as Bachman was standing in front of the toilet, making it equally likely that Amante was trying to use the toilet. (*See id.*; ECF No. 27-7, PageID.352; ECF No. 31, PageID.724; ECF No. 31-7, PageID.726.) And a couple of officers stated that before urinating on Bachman, Amante had urinated on the wall, which suggests he was trying to avoid urinating on officers. (ECF No. 31-6, PageID.725; ECF No. 31-7, PageID.737.) Further, there is no question that Amante had been asking to go to the bathroom since he first arrived at the jail. (ECF No. 27-7, PageID.328–329). Amante also testified that he told officers that once he removed his clothes, he was not going to be able to wait to use the bathroom. (ECF No. 31-1, PageID.648.) True, Bachman testified that Amante said, "Fuck this. I'm just going to piss on you then," before he began to urinate on him. (ECF No. 27-7, PageID.359.) But that merely creates a fact issue on whether Amante was intentionally urinating on Bachman to resist the search.

In all, taking the video evidence and the facts in the light most favorable to Amante, a reasonable jury could conclude that Amante was merely unable to continue to control his bladder and, because he was naked at the time, he urinated on

Bachman. In other words, they could conclude that Amante urinating was not an act of resistance that justified the resulting takedown. *LaPlante*, 30 F.4th at 580 ("We have held that mere noncompliance is not active resistance." (quoting *Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017))); *see also Browning v. Edmonson Cnty., Kentucky*, 18 F.4th 516, 527 (6th Cir. 2021) ("[W]e noted that active resistance generally means: physical struggles with police, threats toward officers, refusal or resistance to being handcuffed, and erratic or irrational behavior." (citation omitted))). *Cf. Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1154 (6th Cir. 2022) ("[A] person's non-compliance with officer's directions may rise to the level of active resistance when combined with 'verbal hostility' or 'a deliberate act of defiance.'").

Otherwise, there is also little evidence that Amante was noncompliant. Bachman testified that leading up to the takedown, Amante was "verbally assaultive" and that at one time during the custody search, he removed his hands from the window despite instructions telling him to keep his hands there. (ECF No. 27-7, PageID.329, 340; *see also* ECF No. 31-6, PageID.729.) And, according to Defendants, by urinating, Amante was not allowing officers to complete the strip search. (*Id.* at PageID.359.)[2]

A reasonable jury could find that these acts do not amount to active resistance or even noncompliance. The custody-search video shows that Amante was visibly

---

[2] Swalwell testified that during the strip search, Amante was not following commands of keeping his hands on the wall or facing the wall. (ECF No. 31-7, PageID.726.) However, the video shows Amante facing the wall for most of the search. (Video Ex. M, :10–:51 (sealed).)

uncomfortable and moving his legs around, presumably because he had to use the restroom. (Video Ex. H, :53–1:05.) So perhaps his hands inadvertently left the glass as he was focused on his need to use the restroom, and not necessarily because he was defying the officers' commands. *See Smith v. City of Troy, Ohio*, 874 F.3d 938, 945 (6th Cir. 2017) ("A reasonable juror could conclude that, in pulling his arm away, Smith's resistance was minimal and that Osting's response in taking Smith to the ground was excessive."). As for him urinating before the strip search was over, the Court has already explained that a reasonable jury could conclude that it was out of Amante's control. And though there is evidence that Amante was swearing and yelling during the incident, he never made any threats toward the officers and no officer stated Amante was physically combative or resisting in a physical way. (ECF No. 27-7, PageID.330, 342, 368; ECF No. 31-6, PageID.722, 725; ECF No. 31-7, PageID.738.) It is also undisputed that Amante was 6 feet tall, about 150 pounds, and naked during the incident. (ECF No. 31-1, PageID.638.) A reasonable jury could thus conclude that the officers had little reason to feel physically threatened by Amante.

True, Amante was arrested on a concealed weapons charge, which weighs in favor of the officers' use of force against him. But he had brass knuckles in his pocket rather than razor blades or some other small weapon. (ECF No. 31-2, PageID.666.) There was no evidence or suggestion that Amante had used that (or any other) weapon against others. And again, by the time Amante was taken down, he was naked, in a jail cell, and surrounded by at least six officers. (Video Ex. L, :51 (sealed).) So while his weapons charge could be cause for concern, a reasonable jury could find

that the other circumstances dissipated much of that concern. Defendants also argue that Amante "could have had unknown weapons hiding in his body cavities[.]" (ECF No. 27, PageID.158.) It is not clear what Defendants are referring to. And regardless, the video evidence does not show Amante moving or gesturing in a way that would suggest he was attempting to access a hidden weapon.

There is also evidence of injury. Amante has submitted hospital records from a few days after the incident. They show "some abrasions to the right side of [Amante's] head in the temporal area. . . . a small abrasion within the right eyebrow without laceration. . . a small abrasion underneath [Amante's] chin which is superficial. . . . [and] tenderness along the" neck. (ECF No. 31-10, PageID.775.) Amante told doctors that "they knocked him down and punched him and kicked him in the head as well as multiple other areas." (*Id.* at PageID.774.) Amante also testified that after the takedown, he saw "in my mirror that I had blood and my mask was completely soaked in blood that they made me throw away. Even the secondary mask I had still had traces of blood on it, that's how much I was bleeding." (ECF No. 31-1, PageID.649.)

In sum, a reasonable jury could find that the takedown was excessive. Once taken to the cell with all of the officers, Amante had generally complied with orders until the time he started urinating. He needed to go to the restroom since before he arrived at the facility. Though he was arrested for carrying brass knuckles, at the time of the takedown, he was naked and surrounded by six officers. No officer thought Amante was a physical threat and he had not made any physically aggressive

29

remarks or movements. It is also possible that Bachman could have employed a different type of force to get Amante to stop urinating on his pants—perhaps by merely turning him back toward the wall or pushing him away as he had previous done. If a jury found these facts to be true, it could rely on them to find that Bachman's takedown maneuver and Swalwell, Schipani, and Bilbia's assistance with the takedown was unreasonable. The Court clarifies that this claim only survives as to the takedown and its immediate aftermath (*see* Video Ex. M, :52–1:03 (sealed)), as Amante does not argue that the officers' restraint of him when he was on the ground was excessive. The video also does not show any other use of force and Amante did not testify to any other force in his deposition. (*See* ECF No. 27-2, PageID.234–235 ("I can't clearly say how any of them hit me, other than the fact I was on the ground.").)

And if a jury believed Amante's version of events, Defendants violated clearly established law. *See Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) ("When the altercation occurred, Toro and Lawler were in the booking room of a police station, where Lawler refused to comply with Toro's orders and called Toro an offensive name. . . . The videotape of the incident, together with Lawler's account of the verbal sparring that preceded it, would permit a jury to conclude that Toro's use of force in throwing Lawler to the floor was disproportionate to any threat he faced from Lawler."); *LaPlante v. City of Battle Creek, Michigan*, 30 F.4th 572, 581 (6th Cir. 2022) ("Importantly, we have determined that the use of a takedown maneuver, in a variety of scenarios, can amount to excessive force. . . . We have also established that

30

such a maneuver is excessive when a suspect surrenders to the police, does not offer resistance, and/or when the interaction happens in the presence of multiple officers" (citing in part *Lawler*, 268 F. App'x at 387)); *Meirthew v. Amore*, 417 F. App'x 494, 495, 499 (6th Cir. 2011) ("The video recording demonstrates some level of resistance by Meirthew when she was placed against the booking room wall. However, the level and form of resistance is disputed and cannot be deciphered clearly from the video. . . . Because it was clearly established that the use of significant force in response to passive resistance may constitute excessive force, and because Meirthew posed no safety threat, Amore is not entitled to summary judgment based on qualified immunity."); *Shumate v. Cleveland*, 483 F. App'x 112, 114 (6th Cir. 2012) ("Blanchard admitted that he was upset when Shumate's saliva sprayed on him. He did not explain why it was necessary to punch Shumate in the face before closing the car door, which would seem to be sufficient to protect him from further spitting. A jury who believed Shumate's version of the facts could find that excessive force was used. Therefore, summary judgment was properly denied on this ground.").

Defendants cite to *Scott v. Kent County* to show that the constitutional violation at issue here was not clearly established. However, it is unpersuasive. Indeed, the *Scott* court found "When Scott walked out, the video shows that his fists are clenched and that Lyons looked at and then pointed to Scott's fists. The video then shows, as Scott concedes on appeal, Scott step toward Lyons, with his fists still clenched and within swinging distance." 679 F. App'x 435, 440 (6th Cir. 2017). Here, Amante had not shown any sort of physical aggression toward any of the deputies.

Indeed, Bachman described him as "verbally assaultive" but not physically threatening. (ECF No. 27-7, PageID.342.) That is distinct from an individual who appears to be on the verge of punching an officer. Accordingly, at this stage, Defendants are not entitled to qualified immunity on Amante's claim that the takedown was excessive.

That leaves four other individual defendants: Raczka, Francisco, Carter, and Rackley. There is no evidence that Francisco participated in or witnessed the takedown or anything else that occurred in the cell with Amante. So she cannot be liable for excessive force.

And Amante has not met his summary-judgment burden of showing that the other three officers failed to intervene. "An officer may be liable for failing to intervene when, "(1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). All three witnessed the takedown and are seen on video. (ECF No. 31-3, PageID.682, 683, 684; Video Ex. L (sealed).) But the takedown and its immediate aftermath was only about eleven seconds. (Video Ex. M, :52–1:03 (sealed).) This is not enough time for the officers to "prevent the harm from occurring." *Cf. Grinnell*, 2022 WL 1562291, at *6 (affirming denial of qualified immunity on failure-to-intervene claim where incident lasted one-and-a-half minutes); *Goodwin v. City of Painesville*, 781 F.3d 314, 329 (6th Cir. 2015) (holding that a twenty-one second tasing followed by an additional

32

five-second tasing was long enough for other officers to intervene). So a reasonable jury could not find that Raczka, Carter, and Rackley failed to intervene while Bachman, Swalwell, Schipani, and Bilbia took Amante to the ground.

In sum, Bachman, Swalwell, Schipani, and Bilbia are not entitled to qualified immunity, but the Court will dismiss Raczka, Carter, Rackley, and Francisco.

### IV. *Monell* Claims

Amante's claim against Oakland County is based on failure-to-investigate and failure-to-train theories under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

### A. Failure to Investigate

A plaintiff may bring a *Monell* claim based on the theory that the municipality has failed to properly investigate and punish allegations of unconstitutional conduct. *See Pineda*, 977 F.3d at 495. The Sixth Circuit has made clear that to prove such a claim, there must be evidence of "not only an inadequate investigation in this instance," but also "a clear and persistent pattern of violations" in earlier instances. *Id*.

Amante quibbles with this understanding of the law. He cites *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), for the proposition that "ratification of an unconstitutional act *after that act occurs* can form the basis of a municipal liability claim." (ECF No. 31, PageID.628.) But since some of these earlier failure-to-investigate cases, the Sixth Circuit has "clarified the scope of this 'ratification' theory" and required evidence of "not only an inadequate investigation in this instance, but

also a clear and persistent pattern of violations in earlier instances." *Pineda*, 977 F.3d at 495. Without such evidence, a plaintiff "has still provided no basis for concluding that any failure to investigate his own claim caused his earlier injury." *See id.* at 496.

Amante cannot make this showing. Apart from his expert's opinion on the mishandling of the investigation concerning the incident at hand, he provides evidence of another case where some of the same Defendants were sued. (*See* ECF No. 31-13.) But one case, especially without any finding of liability, cannot satisfy Amante's burden. The Sixth Circuit required "multiple earlier inadequate investigations," not just one. *See Pineda*, 977 F.3d at 495. Indeed, the Sixth Circuit has found that six incidents is "not sufficient to suggest a 'widespread, permanent' custom that is so 'well settled as to have the force of law.'" *Wallace v. Coffee Cnty., Tenn.*, 852 F. App'x 871, 876 (6th Cir. 2021).

Accordingly, Amante's *Monell* claim against Oakland County based on a failure-to-investigate theory is dismissed because he is unable to show a pattern.

## B. Failure to Train

Amante's failure-to-train claim does not fare much better.

"When determining whether a municipality has adequately trained its employees, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 881 (6th Cir. 2020). The only evidence of failure to train Amante discusses in his brief is Katsaris' report, which states, "The failure to enforce the policies is also a training failure. Incidents of violations that go without discipline reflect that agency

is indifferent to the inmate's safety, security, and care." (ECF No. 31, PageID.628–629.) Neither Katsaris nor Amante explain the nature of the training program Oakland County has in place nor its deficiencies. Amante cites to no evidence regarding the County's training program other than Katsaris' conclusion that the County failed to enforce its own policies, which is an acquiescence argument rather than a failure-to-train argument. And without such information, the Court concludes that no reasonable jury could find that the County's "training program was inadequate for the tasks that officers must perform." *Jackson v. City of Cleveland*, 925 F.3d 793, 834 (6th Cir. 2019).

So Amante's failure-to-train clam against the County is also dismissed.

## V. State Law Tort Claims

### A. Immunity

Defendants argue that Amante's two state-law intentional-tort claims—assault and battery and intentional infliction of emotional distress—should be dismissed because they are entitled to governmental immunity under Michigan law.

To establish such immunity, Defendants must show that "(a) The acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority, (b) the acts were undertaken in good faith, or were not undertaken with malice, and (c) the acts were discretionary, as opposed to ministerial." *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 228 (Mich. 2008). The parties focus on the good-faith element, which is defined as "an intent to harm, or, if not that, such indifference to whether harm will result as to be

the equivalent of a willingness that it does." *Id.* at 225. That element "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* at 229.

Amante's version of events tells a story of officers who took him down to the ground because he could not control his bladder, though he was not verbally or physically threatening and generally complied with the officers' orders. Thus, a reasonable jury could find that Defendants acted maliciously because Amante had been swearing at them rather than out of good-faith concerns about their safety or welfare. *See Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015) (finding fact issue on maliciousness because "[t]aking Brown's version of events as true, the officers threw her onto the ground, despite the fact that she was clearly afraid and cooperating with their orders"); *Shumate v. City of Adrian, Michigan*, 44 F.4th 427, 451 (6th Cir. 2022) ("Having found that Powers' actions are not shielded by qualified immunity, we conclude that Powers is not entitled to governmental immunity under state law."). Further, Defendants' version relies on facts that are in dispute, such as whether Amante intentionally urinated on Bachman to resist the officers' attempt to complete the strip search and whether officers continued to use excessive force on him once he was on the ground. This is improper. *Id.* at 452 ("As with the federal law claims, Shumate relies on facts that are in dispute, and if a jury were to believe Plaintiff's version, Powers would not be entitled to governmental immunity[.]").

So Defendants are not entitled to governmental immunity at this stage. However, because there is no evidence that Raczka, Carter, and Rackley actually

36

participated in any battery or assault, Amante may not proceed with that claim against them.

## B. Intentional Infliction of Emotional Distress

Defendants also challenge Amante's IIED claim on the merits.

To be liable for IIED under Michigan law, the defendant must have engaged in "extreme and outrageous conduct." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (1985). Such conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Graham v. Ford*, 605 N.W.2d 713, 716 (Mich. Ct. App. 1999). "Generally the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the action, and lead him to exclaim, 'Outrageous!'" *Roberts*, 374 N.W.2d at 909.

Even taking the facts in the light most favorable to Amante, the Court finds that he does not meet this standard. While there is a genuine dispute as to whether certain Defendants acted unreasonably, the eleven-second takedown of Amante was not so outrageous that it could be considered "utterly intolerable." Amante presents no evidence that the takedown was accompanied by other derogatory remarks or actions such that it can be considered extreme, especially when considering the general nature of police work and maintaining security in a jail.

So Amante's IIED claim is dismissed.

## VI. Conclusion

For the foregoing reasons, Amante's strip-search and bathroom-access claims (collectively, Count II), IIED claim (Count IV), and *Monell* claim (Count V) are dismissed.

Amante may proceed with his excessive-force (Count I) for the takedown against Bachman, Schipani, Swalwell, and Bilbia. But he may not proceed with his excessive-force claim based on the single kick by an unidentified officer or his failure-to-intervene claim against Raczka, Rackley, Carter, or Francisco. His assault-and-battery claim (Count III) also survives against Bachman, Schipani, Swalwell, and Bilbia only.

As there are no remaining claims against them, Raczka, Rackley, Carter, Francisco, and Oakland County are dismissed from this case.

SO ORDERED.

Dated: June 6, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE